UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
EMILIANO ERMINI,

    Plaintiff,

  -v-           No.  12 Civ. 6100 (LTS)

VIVIANA VITTORI,

    Defendant.
-------------------------------------------------------x

<u>MEMORANDUM OPINION AND ORDER</u>

   Emiliano Ermini ("Petitioner"), an Italian citizen, petitions the Court, pursuant to

the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague

Convention"), as implemented by the International Child Abduction Remedies Act, 42 U.S.C.

§ 11601 <u>et seq.</u> ("ICARA"), seeking the return of his two sons to Italy.  The Court has

jurisdiction of this matter pursuant to 42 U.S.C. § 11603(b).  Petitioner alleges that the two boys,

E.E., age 9, and D.E. age 7,[1] who are Italian citizens, have been retained in the United States by

their mother, Respondent Viviana Vittori ("Respondent"), also an Italian citizen, without

Petitioner's consent since approximately April 2012.

    Petitioner filed this petition on August 9, 2012, expedited discovery and trial

preparation took place in December 2012 and January 2013, and the Court conducted a bench

trial in this case from January 28, 2013 until January 30, 2013.  Petitioner testified and called six

witnesses during his case-in-chief: Respondent; Mario Russodivito (the owner of an Italian

restaurant in Suffern, New York in which Petitioner had considered investing); Dr. Nicola

Antonucci (a psychiatrist who has treated D.E. in Italy); E.E.; Enzo Ermini (Petitioner's father);

---

[1]   To protect the children's identity, pursuant to Federal Rule of Civil Procedure 5.2, the
Court refers to them only by their initials.

and Eloisa Ermini (Petitioner's sister).  Respondent testified during her case-in-chief and called

two other witnesses: John Tempesta (Respondent's first cousin and a family friend) and Dr.

Carol Fiorile (an American board-certified behavior analyst and expert in treating and educating

autistic children).  The Court interviewed E.E. in camera and on the record, but outside the

presence of the parties and their respective counsel.

       Following the bench trial, both parties submitted proposed findings of fact and

conclusions of law and replies to each other's submissions.  The Court has considered carefully

the parties' submissions and arguments.  In accordance with Federal Rule of Civil Procedure

52(a), this Opinion constitutes the Court's findings of fact and conclusions of law.  To the extent

any finding of fact includes conclusions of law it is deemed a conclusion of law, and vice versa.

For the following reasons, the petition is denied.

FINDINGS OF FACT

       Petitioner and Respondent, the parents of E.E. and D.E., began co-habiting in

2001, and were married in Italy in July 2011.  (Tr. 25:6-11).  Respondent has initiated divorce

proceedings in Italy and the parties are now legally separated.  In Italy, Petitioner worked as an

Administrative Manager for a company called T-Line SRL until September 2011 (Tr. 257:24-

258:25), while Respondent worked for IKEA in Rome, Italy (Tr. 33:18-34:5).  Respondent is

still an employee of IKEA's Rome facility, although she was on paid family leave at the time of

trial.  (Tr. 34:2-5.)  E.E. attended public school in Italy up until the second grade (Tr. 27:8-11),

while D.E. attended day care and preschool in Italy.  (Tr. 28:4-5; 29:1-2).  The family came to

the United States in August 2011 in connection with efforts to secure effective medical and

rehabilitative treatment for D.E., who is autistic.

D.E.'s Autism and Treatment

D.E. was diagnosed with autism on March 14, 2008, when he was approximately two years old.  (Tr. 352:11-15.)  Petitioner and Respondent were both committed to helping D.E. and took him to various doctors in Italy as well as abroad in Scotland for medical treatment.  (Tr. 155:24-156:5; 356:11-25.)  Petitioner even considered relocating to Edinburgh.  (Tr. 156:2-5.)  When Petitioner and Respondent's own resources were inadequate to pay for the treatments, they solicited donations through a website and a blog about D.E.  (Tr. 264:1-14.)  Dr. Antonucci was D.E.'s primary treating professional in Italy from December of 2008 until May of 2010.  (Tr. 139:17-21.)  One of the treatments that Dr. Antonucci recommended for D.E. was hyperbaric oxygen therapy, which was eventually administered in a hyperbaric chamber installed in the family home in Velletri, Italy.  (Tr. 123:4-5; 64:23-25.)  He also treated D.E. for gut inflammation, heavy metal intoxication and viral issues believed to be underlying physical causes of autism.  (Tr. 122:4-123:11.)

D.E.'s "support teacher" at his school in Italy did not know any specific techniques for treating children with autism.  On their own initiative, Petitioner and Respondent attended training in Applied Behavioral Analysis ("ABA") techniques at a private institution, Pianeta Autismo, and Respondent attended three additional courses.  (Tr. 353:20-354:5.)  With the permission of the principal of D.E.'s school, Respondent spent two hours each day at D.E.'s school, instructing the support teacher in the ABA techniques.  (Tr. 357:11-358:2.)  Petitioner and Respondent also consulted with another doctor in Italy, Dr. Claudia Lerz, to develop an ABA treatment plan for D.E.  (Tr. 355:7-17.)  According to Respondent's expert, Dr. Fiorile, ABA therapy is "the most common treatment" for children with autism in the United States (Tr. 389:10-11) and it can have an enormous impact on the life of an autistic child (Tr. 389:13-19).  Dr. Antonucci also endorses ABA treatment.  (Tr. 118:21-119:8.)  Respondent estimates that she

personally provided 70-80% of D.E.'s thirty to forty weekly hours of ABA treatment while the family were living in Italy.  Professional ABA treatment would have been preferable but very expensive.  (Tr 353:2-355:6.)  The Italian national health care system covered 90 minutes a week of psychomotility therapy for D. E. for the first year after his autism diagnosis, with an extra 90 minutes of speech therapy during the second year, but did not pay for other types of treatment or therapy for D.E.  (Tr. 352:20-353:5.)

Both Respondent and Petitioner were unhappy with the options for D.E.'s schooling and therapy in Italy as they did not see results in D.E.'s developmental progress.[2] They began to look elsewhere for treatment options, and in October of 2009, the family traveled to Florida for a week, at the recommendation of Dr. Antonucci, to consult with an American doctor about therapies available for D.E. in the United States.  (Tr. 38:1-8; 124:16-21, 155:2.)

Exploration of Treatment Options in the United States

In April or May of 2010, Petitioner and Respondent met Dr. Giuseppina Feingold in Italy.  (Tr. 357:7-17.)  Dr. Feingold is an Italian-speaking pediatrician with a practice in Suffern, New York, who focuses on children with special needs.  In August of 2010, Petitioner and Respondent traveled with E.E. and D.E. to Suffern, New York, so that Dr. Feingold could assess and begin treating D.E.  (Tr. 209:7-10; 302:20-303:2.)  The family stayed with Respondent's first cousins, John and Patricia Tempesta, at their home in Ridgefield, Connecticut.  (Tr. 300:15-24.)  During that August 2010 visit, they met other parents at Dr. Feingold's clinic, who told them about provisions for special needs children at the local schools in the Suffern area.  (Tr 358:23-359:5.)  Both Respondent and Petitioner were impressed by the

---

[2]      Petitioner also brought legal proceedings against the Italian Ministry of Health around this time, as he believes that the Italian mandatory vaccination program may have caused D.E.'s autism.  (Tr. 266:14-25; 268:5-7.)

treatment options available for D.E. in the United States.  (See, e.g., Tr. 328:24-329:2.)

Around this time, Petitioner and Respondent began to formulate a plan for the family to move to the United States for two or three years, during which time Petitioner and Respondent could decide if it would be possible and appropriate to make a permanent move to the United States.  (See Tr. 328:18-21(Respondent) ("we had planned to stay three years in the United States.  But we also discussed that if we felt comfortable here and if the children felt comfortable here, and especially [D.E.], that we might stay permanently"); Trial Ex. C. (Oct. 4, 2010, Email from Petitioner to Mr. Tempesta) ("[t]he most important years for [D.E.] are the next 2-3 years and in them I would like to successfully try all possible treatments. . . . For the time being, plans would be to stay for 2-3 years, but I think that if we succeed in coming, and we're able to stay 3 years I don't think we'll leave afterwards, but it is too early to decide this").) Petitioner asked Mr. Tempesta to send Petitioner's curriculum vitae out to one of Mr. Tempesta's associates to see what positions might be available in the United States and to look into a place to live for the family.  (Tr. 306:11-14; 307:23-308:18.)  Petitioner also asked Mr. Tempesta about schools for E.E. and D.E. (Trial Ex. B.; Tr. 310:18-311:9) and about various visa options, including potentially applying for a green card (Tr. 315:1-12).  In December of 2010, the family returned to the United States so that D.E. could undergo additional treatment with Dr. Feingold and again stayed with the Tempestas.  (Tr. 41:6-8; 209:7-10.)  Petitioner returned to Italy after three weeks and Respondent returned with the children another two or three weeks after that.  (Tr. 155:11-18; Tr. 313:5-7.)

Meanwhile, Petitioner began meeting with Marcello Russodivito, to whom he had been introduced through one of Mr. Tempesta's contacts, about potentially investing in Mr. Russodivito's restaurant so that he could obtain a business visa for himself and derivative ones

for his family, which would allow them to pursue treatment for D.E. in the United States.  (Tr. 88:22-89:4, 97:23-98:14.)  Mr. Russodivito understood that Petitioner planned to fund  the restaurant investment by selling the family's house in Italy.  (Tr: 102:8-13.)

        The Court finds, based on the credible testimony, that Petitioner and Respondent intended to move to the United States as a family for a period of two to three years, during which time medical and rehabilitative treatments would be pursued for D.E., and also agreed that it was possible that the move would be made permanent at the end of the three-year period, circumstances permitting.  Notwithstanding the plan to sell their house in Italy to fund the restaurant investment, there was no agreement to abandon the family's ties to Italy.

The Move to the United States

        The family returned to the United States in August 2011 and, on September 2, 2011, Petitioner and Respondent co-signed a one-year lease for a house near Mr. Russodivito's restaurant.  (Tr. 336:20-23; 341:2-11.)  On September 15, 2011, Respondent, E.E. and D.E. moved into that house.  (Tr. 341:11-14.)  In October, Mr. Russodivito arranged for one of his employees, Pasquale Ruggiero, to share the house with them.  (Tr. 341:12-22.)  In September and November, E.E. and D.E. were enrolled in the local public schools.  (Tr. 348:21-349:2; 358:12-14.)

        Petitioner returned to Italy in September 2011 and gave notice that he was leaving his job.  It was not clear from the testimony at trial whether he planned to quit his job permanently or to return after spending some time in the United States.  In an email to Respondent at the time, Petitioner said that they should ship "books, clothing, any furniture we can't sell, ornaments, dishes, sheets, blankets" in a cargo container from Italy to the United States (Ex. N (Sept. 8, 2011, Email from Petitioner to Respondent)).  Petitioner also researched

the cost of shipping D.E.'s hyperbaric oxygen chamber.  (Tr. 316:20-317:11, 252:21-23).  On

September 13, 2011, Petitioner wrote to the U.S. Consulate in Rome to apply for visas for

himself and his family for the purpose of "explor[ing] the possibilities of entering into a business

partnership with Mr. Marcello Russodivito who already owns an established Italian restaurant in

the city of Suffern, NY.  I also wish to request a B-2 visa for my wife and 2 children, who will

accompany me in this trip to the United States."  (Tr. Ex. 23 (Petitioner's Visa Application).)

Respondent traveled with the two children to Italy to renew their United States visas in

November 2011 and then the children and Respondent returned to Suffern, while Petitioner went

to Italy to finish settling the family's affairs.  Petitioner did not return to the United States until

December 2011.  (Tr. 345:4-5.)  Petitioner again left for Italy in early January 2012, following

an altercation with Respondent (see infra).

      The two children have not left the United States since November of 2011, but

Respondent left the country again in April 2012, to attend court proceedings in Italy.  (Tr. 345:6-

16.)  On December 1, 2012, Respondent and the two children moved to their current residence in

Suffern with Mr. Ruggiero.  (341:17.)  Petitioner never relocated to the United States.

Marital Problems and Domestic Violence Allegations; Court Proceedings

      Petitioner returned to the United States in December 2011.  The personal

relationship between Petitioner and Respondent has been tempestuous for some time, and

Petitioner expresses anger verbally and physically.  Respondent and E.E. testified credibly that

Petitioner has on many occasions been verbally abusive to Respondent and to the children, and

that Petitioner is in the habit of striking the children on the back of the head, sometimes in what

he believes is a playful manner and sometimes for discipline.  According to Respondent,

Petitioner would address E.E. as "[l]ittle turd, little piece of shit, you are a failure."  (Tr. 351:3-

9).  E.E. also testified that Petitioner would "yell" at and "insult" him and D.E. about "twice a day, every day."  (Tr. 178:12-179:1.)

Respondent further testified that Petitioner "would hit [E.E.] on the nape, both when he deemed it to be just but also to just kid around . . ." (Tr. 351:10-16).  E.E. confirmed that "[i]n Italy, when my father was in the house, I was tense because he, he like, whenever, I did something wrong or dropped a glass on the table, he would yell at me.  And sometimes he would slap me like this for no reason [gesturing towards the back of his head]" (Tr. 177:5-8), and that the slap hurt at a pain range of "eight and a half" on a scale of one to ten.  (Tr. 179:4-14).  The contact caused pain to E.E. but there is no indication of lasting physical injury.  Both Respondent and E.E. testified that Petitioner had also spanked D.E (Tr. 360:4-7), although E.E. said that this was infrequent and happened "almost never, once, twice, maybe like three times a month" (Tr. 194:10-12).  Respondent testified credibly that Petitioner had hit her at least 10 times during the course of their relationship, and proffered somewhat vague testimony that one of the incidents had resulted in a medical diagnosis of the fracture of her finger.  E.E. testified to having twice seen a bruise on his mother after incidents in which Petitioner had hit Respondent during fights in Italy, and that he had never seen his mother hit his father.  (Tr. 196:10-197:1  Arguments between the two were frequent while the family was living in Italy.

The couple had a violent altercation in the kitchen of their Suffern residence on December 28, 2011.  Respondent testified that Petitioner "grabbed" Respondent and "shoved [her] head on the kitchen cabinets" (Tr. 345:24-25) and then Petitioner tried to "suffocate [her] with [her] shirt" and "to strangle [her]."  (Tr. 346:1-4.)  This incident occurred in front of the children.  E.E. testified credibly that he saw his father hold his mother's head and "bump it into a cabinet."  E.E. "felt scared."  (Tr. 194:15.)  According to Respondent, Petitioner also "shut the

two doors that led to the outside, and he said that if this had to be over, it was best if we all died"
and "went towards the gas outlet to switch the gas on." (Tr. 346:7-10.) Respondent testified that
she "had some bruises and some scratching around [her] neck and on [her] arms" and her "head
hurt" as a result of this incident. (Tr. 73:5-7.) Petitioner denied at trial that he smashed
Respondent's head against the cabinet, but did admit that he had a fight with Respondent on
December 28, 2011, in Suffern. (Tr. 162:19-20.) After this incident, Respondent spent
December 28 and December 29, 2011, in a nearby hotel, leaving the children at the house with
Petitioner for that time (Tr. 368:10-17), and Petitioner left the United States to return to Italy
alone on January 4, 2012. (Tr. 160:24-161:2.)

On February 6, 2012, Respondent reported the December 28, 2011, incident to the
Suffern Court of Justice. Respondent testified credibly that she delayed making the complaint
because she was worried and wanted to wait until Petitioner returned to Italy and because, based
on Petitioner's threats in the past, she was concerned that Petitioner would stop providing
financial support for Respondent and the children if she were to leave Respondent. (346:11-21.)
On February 9, 2012, Respondent obtained a temporary order of protection from the local court
for herself and the children, which ordered Petitioner to "stay away" from Respondent and the
children and to refrain from communication, assault or other forms of physical abuse and also
awarded Respondent temporary custody of the children through May 9, 2012. (Tr. 347:11, Ex.
U, Family Court of Rockland County Temporary Order of Protection.) In February 2012,
Petitioner received notice of this temporary order (Tr. 276:1-6) and, according to Respondent,
began asking for the children to be returned to Italy (Tr. 347:9-19). Petitioner also stopped
providing money to Respondent and the children. (Tr. 375:13-16.)

Petitioner testified at trial that he thought that the children were coming back with

Respondent to Italy after they had finished school for that year, which was when their visas expired, but around April 2012, he realized that they were not returning.  (Tr. 163:23-164:1.) This was confirmed on April 23, 2012, when Respondent came to Italy for the divorce proceedings and did not bring the children.  (Tr. 211:11-21.)  Petitioner continued to try to make contact with his children throughout this time.

In the United States, the Rockland County Family Court's order of protection allowed Petitioner to speak with the children over Skype and to contact Respondent to arrange visitation or other issues pertaining to the well-being of the children.  (Ex. EE.)  Respondent testified that, in March 2012, she would have allowed Petitioner to speak to the children whenever they wanted to speak to their father and that there was a precise time established by the Suffern Family Court of 4:00 to 4:30 p.m. every day, but that the time could change if either party had other commitments.  (Tr. 68:1-19.)  Petitioner testified that he hadn't seen his children over Skype since January 4, 2012, although he called every single day; and he said that it was because Respondent would not let him see them.  (Tr. 152:2-3.)  While E.E. did not testify specifically about the Skype calls, he expressed and exhibited a strong aversion to contact with his father.  The Court finds Respondent's testimony as to the reason for the non-participation by the children in the Skype conversations from February until April to be credible (namely, that they did not want to come to the computer to speak to their father).

On April 26, 2012, Respondent reported to the Suffern police that on April 11, 2012, Petitioner had threatened her over Skype.  Petitioner was charged with criminal contempt in the second degree and his authorization to Skype with the children was revoked.  (Tr. 69:1-8; Ex. EE.)  Respondent deleted Petitioner from her Skype contact list, so that Petitioner was no longer able to make contact with the household via Skype.  However, Petitioner still tried to

assert his rights of custody over the children in other ways.  For example, in July 2012, Petitioner bought E.E. a plane ticket to come and visit him in Italy, which was never used.  (Ex. 11.)  Petitioner also continued to pay the mortgage on the family home.  (Tr. 229:11-230:17.)

On July 23, 2012, Petitioner pled guilty to harassment in the second degree to resolve criminal charges arising from the December 28, 2011, incident.  (Ex. II.)  In connection with the guilty plea, Petitioner consented to a one-year order of protection directing him to stay away from Respondent and the children.  (Id.)  A further one-year order of protection, with the same terms–forbidding communication or any other contact by mail, telephone, e-mail etc. "except as permitted by a Custody or Visitation order issued by any Court of competent jurisdiction" was entered on consent on January 12, 2013.  (Ex. TT.)

Meanwhile, on September 20, 2012, Petitioner applied to the Italian court for an order directing the Respondent to return with the children to Italy and provisions for visitation with the children.  With only Petitioner in attendance, the court in Velletri ordered Respondent to return to Italy with the children and also ordered temporary measures including that Petitioner and Respondent would live separately but share parental authority; that Respondent and the children would live in the family home; that Petitioner could visit 8-12 hours per week; and that Petitioner would pay spousal and child support of 1,600 Euros per month.  (Ex. 25.)  At the time of trial, Respondent had not complied with the Italian court's order to return to Italy with the children, nor had there been visitation or any other contact between Petitioner and the children.

Respondent appealed the Velletri Court's order and, on April 5, 2013, the Court of Appeals in Rome vacated several provisions of the September 20, 2012, Order and granted Respondent exclusive custody of the children.  The April 5, 2013, Order, also withdrew the Velletri Court's prior order requiring that Respondent return to Italy, revoked the award of the

family home to Respondent, and revoked the Petitioner's visiting rights and rights of access to the children.  (Id.)  Although the April 5, 2013, Order provides Respondent with exclusive custody of the children, it does not necessarily moot Petitioner's application to this Court because it is a temporary order, which appears to have been designed, at least in part, to conform to the protective orders in the United States, which are in effect until 2014.  (See April 5, 2013, Order, at 4 (docket entry no. 73)("[a]nother element of fact which is before the Court concerns the protection order to safeguard [Respondent] and her children issued in the United States against [Petitioner] ending in February 2014.  The existence of such a restrictive measure, at least until it is no longer in effect, precludes shared custody of the children, with custody having to go to the mother, who is the only one of the two parents able to take care of them and make decisions affecting them")).  It expressly contemplates further investigative and adjudicative proceedings in the lower court.  (Id. at 3.)

E.E.'s Experience in the United States

When interviewed in camera by the Court, E.E. displayed a remarkable command of the English language for one so young and so relatively new to the United States, as well as candor, maturity and an appreciation of the significance of his oath to testify truthfully.  He is happy and comfortable living in the United States with his mother, brother and Pasquale Ruggiero.  (Tr. 175:24-176:1; 198:1-9; 199:25-200:8.)  Mr. Ruggiero cooks for the household, participates in family outings, and is close to both E.E. and D.E.  (Tr. 174:16-18; 204:24-205:4.)

E.E. prefers his school in the United States to the school he attended in Italy, principally because the school here is better-resourced.  (Tr. 185:2-21; 202:14-17.)  He had school friends and extracurricular activities in Italy, and also has friends and participates in extracurricular activities, such as tennis and soccer, here.  (Tr. 350:24-351:2.)

E.E. has comfortable family relationships with his mother's relatives in the United States, and his mother's parents have visited from Italy on several occasions.  (Tr. 200:9-17; 201:24-202:13.)  Although he misses his relatives in Italy, he is reluctant to return to Italy for fear of contact with his father.  He does not want to see his paternal relatives because they "talk bad about [his] mom."  (Tr. 191:17-18.)

E.E.'s preference for the United States arises principally from two considerations. Foremost, the absence of his father, whom he fears and dislikes, from the household, and, secondarily, the superiority of the school and supportive services that have been made available to him and his brother in the United States.  The fear of his father is not fear of mortal peril. Rather, he understandably does not want to live in proximity to someone who hits and yells at him, his brother and his mother, and he does not want to live in a household in which arguments and altercations are part of daily life.

E.E. does not exhibit a subjective change of his residential identification from Italy to the United States.  Rather, his reluctance to return to Italy is closely related to his desire to be separated from his father.  In short, he appears to equate being in Italy to being with or near his father, and perceives contact with his father's family as likely to involve insulting behavior toward his mother.  The Court did not explore with E.E. his understanding of the ability of the Italian courts to fashion custody and other family relations orders.

D.E.'s Experience in the United States

D.E. is severely autistic and has only a limited capacity for speech.  He did not appear in court.  Respondent and Mr. Ruggiero take care of feeding D.E., grooming him and ensuring that he is supervised and occupied.  (Tr. 342:21-343:12.)  According to Respondent and to Dr. Fiorile, D.E. has significantly progressed in his school environment in the United States

and is moving closer to being able to lead an independent life.  (Tr. 406:9-12; Tr. 329:17-20.)

When he first began school in the United States, D.E.'s test results were far below average; at

age six, he presented with the fine motor skills of a three year old.  (Ex. VV at 8.)  Dr. Fiorile

opines that D.E. performed poorly on the testing because his Italian treatments had been

deficient.

       According to Dr. Fiorile, the CABAS program,[3] which D.E. currently attends at a

school in Stony Point, New York, offers the best ABA curriculum available to autistic children.

(Tr. at 402:20-25.)  Dr. Fiorile testified that D.E. has "one-to-one instruction" throughout the day

(Tr. 401:7-13) and has made "exceptional progress" (Tr. 401:14-402:13, Ex. VV).  Dr. Fiorile

explained that the high level of intervention in D.E.'s current classroom setting is the key to his

success.  His educational team consists of a special educational teacher, an occupational

therapist, a speech/language therapist, multiple classroom assistants, and a full-time one-to-one

teaching assistant.  (Ex. VV at 7.)  D.E. is given instruction in both Italian and English.  At

school, D.E. is working on following one-step directions and on using nouns and verbs correctly.

(Ex. VV at 8.)  Respondent testified that D.E. can say about ten words in English, almost as

many as he can say in Italian.  (Tr. 33:7-12.)  Respondent is currently working with D.E. to

perfect his morning routine.  She also participates in monthly training programs for parents

provided by D.E.'s CABAS program.  (Tr. 343:5-14, Ex. VV at 8.)

       Dr. Fiorile further opined that D.E. requires a program like the one in which he is

currently enrolled to continue to making meaningful progress in, among other things, cognition,

language, social and emotional skills.  (Tr. 397:2-12.)  Respondent testified that, when D.E. first

---

[3]    "CABAS" is an acronym for Comprehensive Application of Behavioral Analysis to
Schooling and it is "an intensive, data-driven specialized ABA program."  (Ex. VV at
7.)

arrived to the United States, he suffered regression caused by the disruption to his life and

routine in Italy.  (Tr. 329:13-15.)  D.E. has also experienced skill regression following his school

vacations.  (Ex. VV at 8.)  Dr. Fiorile explained that, because of D.E.'s "severe deficits, it is

essential that the skills be maintained over time, and subsequently generalized to other settings."

(Ex VV at 8.)  Dr. Fiorile further opined that, if D.E. "were to be removed from this educational

program and not provided this intensity of educational programming that's being provided by

highly skilled and trained professionals" (Tr. 404:20-23), he will face "a severe loss of the skills

he has successfully developed since beginning in CABAS . . . ."  (Ex. VV at 8.)

 While the United States has over 4,000 board certified ABA practitioners, Dr.

Fiorile knows of fewer than twenty in Italy.  (Tr. 415:1-12).  Respondent had to help deliver

ABA therapy to D.E. in Italy but, in the United States, she no longer has to be in the classroom

with D.E.  (Tr. 358:7-11.)  Dr. Fiorile concluded in her January 11, 2013, Report, admitted into

evidence at trial, that if D.E. is separated from his CABAS program, he "will most certainly fail

to make the same level of progress and will, without doubt, demonstrate significant skill

regression" and that it would be "extremely harmful" to return him to Italy at this time.  (Ex. VV

at 13.)

 The Court finds that D.E. has benefitted immensely from the superior resources of

the school program in which he has been enrolled while residing in the United States.  The

CABAS program, with its structured, intensive curriculum and extensive classroom support,

provided by professionals, has resulted in marked improvement of D.E.'s self-care,

communication, vocabulary in English and Italian and his general cognition, although D.E. has

suffered regression on weekends and school breaks.  The unrebutted testimony of Dr. Fiorile at

trial and her expert report support the conclusion that "[a]ny hope for [D.E.] to lead an

independent and productive life rests in his participation in an intensive behavioral program that rigorously implements the principles and strategies of Applied Behavior Analysis (ABA), such as the school program he currently attends on a daily basis." (Ex. VV at 4.)  The hard work and good intentions of Respondent and Petitioner are not sufficient to enable D.E. to progress to the extent to which he is capable.  Moreover, there was no evidence presented at trial that any comparable program is even available to D.E. in Italy.  Accordingly, separating D.E. from the CABAS program, while it remains available to him, would put him in an intolerable situation due to the grave risk of deterioration of his condition and denial of needed rehabilitation.

<u>Relationship between E.E. and D.E.</u>

The testimony at trial indicated that E.E. and D.E. have a close, loving, relationship and that E.E. helps his mother in caring for D.E.  Respondent explained that D.E. sees his older brother "as a kind of super hero because he follows him [in] everything he does" and sits next to him watching everything.  (Tr. 362:12-14.)  As for E.E., Respondent said that he "always has a very protective attitude" towards his younger brother.  (Tr. 362:18-19.)  E.E. testified that he likes to share his room with his brother (Tr. 175:9-12) and that he "would like to take care of [D.E.]," but that D.E. does not always do what he says (Tr. 198:14-16).  E.E. has been a source of stability in D.E.'s life and it was clear from E.E.'s testimony that he also feels very close to D.E.

<u>Family's Current Immigration Status</u>

Respondent testified that she and the children do not currently have legal immigration status in the United States, as they overstayed their visas in April of 2012.  (Tr. 35:23-24, Tr. 209: 21-24.)  In October or November of 2012, Respondent applied for a visa for herself and the children on the basis of the domestic abuse that she suffered.  (Tr. 348:10-16.)

Her application is currently pending.  If Respondent and the children were required to repatriate to Italy, there is no indication that they would necessarily be permitted to return to the United States.  There is also no indication in the record that either E.E. or D.E. faces an imminent risk of being excluded from their school programs, nor that they or Respondent face an imminent risk of deportation.

<u>CONCLUSIONS OF LAW</u>

The Hague Convention, to which the United States and Italy are both parties, is designed to "to secure the prompt return of children wrongfully removed to or retained in any Contracting State," and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States."  Hague Convention, Art. 1.  A person may exercise his or her rights under the Convention "by filing a petition for the relief sought in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed." 42 U.S.C. § 11603(b) (West 2005).  In order to prevail, the petitioner must establish by a preponderance of the evidence that "the child has been wrongfully removed or retained within the meaning of the Convention . . ."  42 U.S.C. § 11603(e) (West 2005).

"[T]o establish a prima facie case, Petitioner must prove by a preponderance of the evidence that: (1) the children were habitually resident in Italy, but were removed to or retained in the United States; and (2) the removal or retention was in breach of Petitioner's custody rights under the law of Italy, and Petitioner was exercising those rights at the time of the children's removal to or retention in the United States."  <u>Pignoloni v. Gallagher</u>, No. 12 Civ. 3305 (KAM)(MDG), 2012 WL 5904440, at *18 (E.D.N.Y. Nov. 25, 2012) (citations omitted). "The petitioner must establish these requirements by a preponderance of the evidence."  <u>Gitter v.</u>

Gitter, 396 F. 3d 124, 131 (2d Cir. 2005) (citing 42 U.S.C. § 11603(e)(1)(A)).  Once a petitioner

has established a prima facie case of wrongful removal or retention, the burden shifts to the

respondent, who may assert several affirmative defenses against the return of the children to the

country of habitual residence.

The Prima Facie Case

  Habitual Residency

   "Determination of a child's habitual residence immediately before the alleged

wrongful removal or retention is . . . a threshold question in deciding a case under the Hague

Convention."  Karkkainen v. Kovalchuk, 445 F.3d 280, 287 (3rd Cir. 2006) (citation omitted).

However, "[t]he Hague Convention, itself does not provide any definition of 'habitually

resident.'"  Gitter, 396 F.3d at 131 (citation omitted).  The Second Circuit has established the

following procedure and legal standards for determining a child's habitual residence:

> First, the court should inquire into the shared intent of
> those entitled to fix the child's residence (usually the
> parents) at the latest time that their intent was shared.  In
> making this determination the court should look, as always
> in determining intent, at actions as well as declarations.
> Normally, the shared intent of the parents should control
> the habitual residence of the child.  Second, the court
> should inquire whether the evidence unequivocally points
> to the conclusion that the child has acclimatized to the new
> location and thus has acquired a new habitual residence,
> notwithstanding any conflict with the parents' latest shared
> intent.

Gitter, 396 F.3d at 134 (emphasis added).

  *Shared Intent of the Parties*

   The "primary consideration in determining a child's place of habitual residence is

the shared intention of the child's parents 'at the latest time that their intent was shared'" and the

court should consider whether the intent of either of the parties was conditional.  Mota v. Castillo, 692 F.3d 108, 113-14 (2d Cir. 2012) (finding that shared intention of habitual residence in Mexico never changed when Petitioner intended that her daughter live in the United States "only if she herself could join the household and continue to raise her child," and Petitioner was unable to emigrate to the United States) (emphasis in original).  The court should examine "whether the parents formed a shared, 'settled intention' to 'abandon' the child's previous habitual residence, and whether the parents 'have mutually intended that the child acquire a new habitual residence in a new location.'"  Poliero v. Centenaro, 373 F. App'x 102, 104 (2d Cr. 2010) (citing Gitter, 396 F.3d at 134); see also Barzilay v. Barzilay, 600 F.3d 912, 918 (8th Cir. 2010) ("[t]he settled purpose of a family's move to a new country is a central element of the habitual residence inquiry.  This settled purpose need not be to stay in a new location forever, but the family must have a sufficient degree of continuity to be properly described as settled").

Here, the evidence at trial indicated that there was no shared, settled intention to change the habitual residence of E.E. and D.E. to the United States.  Petitioner and Respondent agreed that they would relocate as a family to the United States and explore treatment and rehabilitation modalities for D.E. for two or three years, with the possibility of a permanent relocation thereafter if things worked out well.  They did not share an unconditional intention to change the children's habitual residence to the United States; Petitioner, in particular, did not intend to live apart from his children and wife.  Although Petitioner stopped working for his employer in Italy, neither Petitioner nor Respondent sought employment immediately in the United States; instead, Respondent continued to receive a salary under her family leave from the IKEA facility where she had worked in Italy and Petitioner returned to Italy.  Petitioner and Respondent put their Italian house on the market (intending to invest in Mr. Russodivito's

restaurant), but they never actually sold the Italian house, and they only signed a one-year lease on a house in the United States.  (Trial Ex. M (September 2, 2011 Lease).)  Everything was done for the purpose of obtaining treatment for D.E.

    To the extent that Petitioner considered the possibility of the children remaining in the United States permanently, he thought of such a possibility only if he, as the father of the children, was also living there.  See Mota, 692 F.3d at 115 "([petitioner's] intention that [the child] live in the United States only if she, as mother, were able to join [the child] there is dispositive of [the Court's] determination of [the child's] habitual residence" because the parents did not agree the child would live in America regardless of petitioner's presence).  Because the conditions appurtenant to even the intended temporary relocation to the United States were not fulfilled – Petitioner, Respondent and the children never established a family life together in the United States, the shared intention prong of the test establishes Italy as the children's habitual residence for Hague Convention purposes.

    This Court's finding that Italy remained the children's habitual place of residence is consistent with the case law in the Second Circuit on this issue.  In Gitter, 396 F.3d at 128, Israeli-born parents, who had been living in New York for the entirety of their relationship, decided to "try living in Israel for one year" and, after deciding to move, "closed their New York bank accounts, sold their cars, and placed their furniture in storage."  After approximately fifteen months in Israel, the mother returned to New York with the child and refused to go back to Israel, and the father brought an action under the Hague Convention seeking a return of the child.  Id. Although "some indicators tend[ed] to suggest that [the parties'] stay in Israel might be of indefinite duration," ultimately only the father decided to stay in Israel permanently.  Id. at 135. The Second Circuit found that there was no "settled mutual intent to make Israel [the child's]

permanent home."  Id. (quoting Gitter, No. 03 Civ. 3374(GT), 2003 WL 22775375, at *10

(E.D.N.Y. Nov. 20, 2003)).

        Similarly, in Poliero, 373 F. App'x at 105-106, the Second Circuit affirmed the

district court's finding that Italian parents who had moved with their children to New York for

two years at "no time formed a 'shared settled intention' to abandon Italy as the children's

habitual residence."  Id. at 105 (citation omitted).  Despite the fact that the children attended two

years of school in New York, the Court held that Italy was still the children's habitual residence,

citing evidence that the parties did not attempt to sell their family home in Italy, maintained their

personal belongings and furniture in Italy, leased apartments in New York for a short period of

time, and maintained continuous connections with Italy.

### *Children's Acclimatization to New Country*

        After it has determined the parents' last shared intent as to the child's habitual

residence, the Court must consider "whether the evidence unequivocally points to the conclusion

that the child has acclimatized to the new location and thus has acquired a new habitual

residence."  Gitter, 396 F.3d at 134.  "This may be so when 'the child's acclimatization to the

location abroad [is] so complete that serious harm to the child can be expected to result from

compelling his return to the family's intended residence.'"  Heydt-Benjamin v. Heydt-Benjamin,

404 F. App'x 527, 529 (2d Cir. 2010) (citation omitted).  "[C]ourts should be 'slow to infer' that

a child's acclimatization 'trumps the parents' shared intent.'"  Mota, 692 F.3d at 115-16 (citation

omitted).  It is only rarely that a child's degree of acclimatization is so complete that a court can

conclude that the child's habitual residence has shifted.  See Mozes v. Mozes, 239 F.3d 1067,

1081 (9th Cir. 2001) ("[t]he question . . . is not simply whether the child's life in the new country

shows some minimal degree of settled purpose, but whether we can say with confidence that the

child's relative attachments to the two countries have changed to the point where requiring return

to the original forum would now be tantamount to taking the child out of the family and social

environment in which its life has developed") (internal quotation marks and citation omitted)).

   Here, both children have adapted to living in the United States.  E.E., especially, is

very involved in school and community activities.  However, E.E. was also active in the school

and community in Italy.  Respondent's expert witness, Dr. Fiorile, testified that, due to his

developmental deficiencies, D.E.'s return to Italy would pose serious adjustment problems

causing a regression in his developmental progress.  The trial testimony did not demonstrate,

however, that D.E. has necessarily acclimatized to life in the United States so much as it

established that, due to the severity of his autism, D.E. must be enrolled in a CABAS program if

he is to have any chance of leading an independent and productive life.  The Court does not find

that there was acclimatization of either or both of the children to the new country so as to

outweigh the parents' shared intent, especially since Respondent and the children's uncertain

immigration status in the United States "places an additional obstacle on the path to determining

that a supervening acclimatization has occurred."  Mota, 692 F.3d at 116.

   Accordingly, the Court concludes that the children's habitual residence for Hague

Convention purposes at the time of their retention in the United States was Italy.

   <u>Wrongful Retention</u>

   Having found that Italy was the country of both children's habitual residence,

"[t]he court must also determine whether Respondent's [retention] of the children [in the Untied

States] violated Petitioner's custody rights under Italian law and, if so, whether Petitioner was

exercising those rights at the time of the [retention]."  Pignoloni, 2012 WL 5904440, at *40.  The

evidence indicates that Respondent formed her intention to retain the children in the United States

some time between February and April 2012.  Petitioner testified that he understood that E.E. and D.E. would not be returning to Italy at some point around April 2012.  (See Tr. 163:23-164:1; 209:13-24.)

"Under the Hague Convention, custody rights are defined as 'rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence.'"  Poliero v. Centenaro, No. 09 Civ. 2682, 2009 WL 2947193, at *11 (E.D.N.Y. Sept. 11, 2009) (citing Hague Convention, art. 5), aff'd, 373 F. App'x 102 (2d Cir. 2010).  "In addition to establishing the right of custody of the children, petitioner bears the burden of establishing by a preponderance of the evidence that the children were retained in breach of those custody rights, and that he was exercising his custodial rights at the time of retention."  Poliero, 2009 WL 2947193, at *12 (citation omitted).[4]  The Supreme Court has taken an expansive view of "rights of custody" for the purposes of a Hague Convention claim.  See Abbott v. Abbot, 130 S. Ct. 1983, 1995 (2010) (finding that, "rather than defining custody in precise terms or referring to the laws of different nations pertaining to parental rights, the Convention uses the unadorned term rights of custody to recognize all the ways in which custody of children can be exercised through a flexible interpretation of the terms used, which allows the greatest possible number of cases to be brought into consideration") (internal quotation marks and citations omitted).  "Generally, courts 'liberally find' that rights of custody have been exercised unless evidence demonstrates 'acts that constitute clear and unequivocal abandonment of the child.'"  Larbie v. Larbie, 690 F.3d 295, 307 (5th Cir. 2012) (citation omitted).

The Hague Convention provides that a court may take judicial notice of the law of

---

[4]     The question of whether Petitioner was exercising his custodial rights at the time of detention is also relevant to an affirmative defense raised by Respondent.

the habitual residence in order to determine whether a removal or retention breached petitioner's

rights of custody:

> In ascertaining whether there has been a wrongful removal
> or retention within the meaning of Article 3, the judicial or
> administrative authorities of the requested State may take
> notice directly of the law of, and of judicial or
> administrative decisions, formally recognized or not in the
> State of the habitual residence of the child, without recourse
> to the specific procedures for the proof of that law or for the
> recognition of foreign decisions which would otherwise be
> applicable.

Hague Convention, Art. 14.

At trial, Petitioner did not proffer any specific evidence regarding Italian custody

law but there is no indication that anything occurred in Italy prior to the retention in the United

States that would have disturbed Petitioner's normal custodial rights under Italian law.  The Court

takes judicial notice of Title IV, Italian Civil Code of Law, Art. 316 ("[a] child is subject to the

authority of its parents until majority . . . or emancipation.  The authority is exercised by both

parents by mutual agreement") and Title IV, Italian Civil Code of Law, Art. 144 ("[t]he spouses

agree between them the pattern of family life and fix the residence of the family according to the

requirements of both and to those prevailing for the family.  Each of the spouses has the authority

to implement the agreed pattern").  Thus, Petitioner had rights of custody under Italian law in

April 2012, when the retention of the children in the United States began.

"[E]ven upon proof that Petitioner has custody rights, Petitioner 'must prove that

he was actually exercising his rights of custody at the time of the retention.'"  Pignoloni, 2012

WL 5904440, at *19.  Here, although Petitioner had not been living with Respondent and the

children, he was actively supporting the children and playing a decisive role in the major

decisions in their life up until February of 2012, a couple of months before Petitioner realized that

Respondent did not intend to return with the children.  When Petitioner received a temporary order of protection against him in February of 2012, he tried to maintain contact with the children and stay involved in their lives, but was not permitted to do so.  See In re Lozano, 809 F. Supp. 2d 197, 220 (S.D.N.Y. 2011) (finding that "Petitioner would have exercised his custody rights if not for Respondent's retention of the child . . .").  Here, the record demonstrates that Petitioner was exercising his custody rights.  He continued to travel periodically to visit Respondent and the two children in the United States while finalizing the family's relocation arrangements and he provided support up until the time that Respondent decided, over his objection, to retain the children in the United States.  Petitioner has not given any indication that he intended to abandon his right to custody over the children and even bought E.E. a plane ticket to come and visit him in Italy in July of 2012.  This conduct is indicative of the exercise of custody rights within the meaning of the Hague Convention.  See Friedrich v. Friedrich, 78 F.3d 1060, 1065 (6th Cir. 1996) ("[t]he only acceptable solution, in the absence of a ruling from a court in the country of habitual residence, is to liberally find 'exercise' whenever a parent with de jure custody rights keeps, or seeks to keep, any sort of regular contact with his or her child").

Respondent cites the February 9, 2012, Rockland County Court temporary order of protection ("stay away" order to keep Petitioner away from the children), which awarded her "temporary custody" of the children until May 9, 2012, as determinative of the propriety of her retention of the children.  (See Ex. U; Tr. 277:14-20).  This "stay away" order was later extended; but the later "stay away" order did not include a temporary custody provision and had a carve-out providing that Petitioner had to refrain from any contact with Respondent or the children "except as permitted by a Custody or Visitation Order issued by any Court of competent jurisdiction." (Ex. TT.)  The original temporary order was no longer in effect at the time of trial.

In September 2012, when Petitioner filed suit in the Italian court, the Italian court issued an order requiring Respondent to return the children to Italy, that Respondent live with the children in the family home, that Petitioner be required to find another residence, and that Petitioner be permitted to visit the children.  Respondent did not comply with the Italian court's orders.  Thus, at least until the most recent April 5, 2013, Italian Court of Appeals Order, Respondent was retaining the children in the United States in violation of Petitioner's custody rights under Italian law.

The April 5, 2013, Italian Court Order awards Respondent exclusive custody of the children.  Accordingly, Respondent's retention of the children is currently consistent with Petitioner's custody rights as limited by the Italian court and thus not wrongful within the meaning of the Hague Convention.  However, the April 5, 2013, Order is concerned with temporary measures pending further proceedings and is likely to be appealed.  Therefore, the Court will consider Respondent's affirmative defenses and determine whether any of them would warrant refusal of an order to return the children should Petitioner succeed in obtaining an Italian court order reinstating his custodial rights.

<u>Affirmative Defenses</u>

The Hague Convention provides four affirmative defenses that a respondent can raise to prevent the return of the child to the country of habitual residence.  <u>See</u> <u>Blondin v.Dubois</u>,

189 F.3d 240, 245 (2d Cir. 1999).  These four affirmative defenses are: (1) "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation;" (2) that "return of the child would not be permitted by the fundamental principles . . . relating to the protection of human rights and fundamental freedoms;" (3) "the judicial proceedings were not commenced within one year of the child's abduction and the child is well-settled in the new environment," and (4) that the petitioner was "not actually exercising custody rights at the time of the removal."  Id. at 245-46.  The first two defenses must be proven by clear and convincing evidence, however "subsidiary facts may be proven by a preponderance of the evidence."  Souratgar v. Fair, No. 12 Civ. 7797(PKC), 2012 WL 6700214, at *5 (S.D.N.Y. Dec. 26, 2012).  The third and fourth defenses need be proven only by a preponderance of the evidence.  Blondin, 189 F.3d at 246.  As the Court finds here that Respondent has proven by clear and convincing evidence that the return of the children to Italy would implicate a grave risk of harm, the Court need not address the other affirmative defenses raised by Respondent.

Grave Risk of Harm Affirmative Defense

The record demonstrates by clear and convincing evidence that, because D.E. is severely autistic, he faces a grave risk of harm if he has to return to Italy, as the return will severely disrupt and impair his development.  In this Circuit, courts have emphasized the severity of the psychological or physical harm required under the "grave risk of harm" affirmative defense.  See, e.g., Reyes Olguin v. Cruz Santana, No. 03 Civ. 6299 JG, 2005 WL 67094, at *6 (E.D.N.Y. Jan. 13, 2005) (citation omitted) ("[t]here is a spectrum of harms a repatriated child may suffer.  At one end 'are those situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's

preferences; at the other end of the spectrum are those situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation'"). Because "returning a child is likely to present adjustment concerns in almost every Convention case," the Court should examine whether the child is likely to "suffer long-term permanent harm if returned." In re Lozano, 809 F. Supp. 2d at 222 (internal quotation marks and citation omitted).

Here, D.E. had the fine motor skills of a child half his age when he first came to the United States.  He is currently enrolled in a premier ABA school program and has made significant developmental progress.  Dr. Fiorile has proffered credibly that, if D.E. leaves the Stony Point CABAS program even temporarily, he will face a significant regression in his skills and that without such an intensive, structured program, D.E. will not develop the cognitive, language, social, emotional and independent living skills that he is likely to acquire through such a program.  Petitioner did not present any testimony controverting Dr. Fiorile's considered assessment.

Respondent has further proven that there is a significant lack of resources in Italy for treating autism as compared to those available in the United States.  D.E. had multiple doctors in Italy who were involved in his care including, Dr. Nicola Antonucci and Dr. Claudia Lerz.  However, he met with most of these doctors infrequently and none of them were able to provide the intensive behavioral instruction that D.E. has been able to receive in the United States.  There is no indication that D.E. could ever obtain the treatment and resulting positive prognosis that he has gained through the CABAS program were he to return to Italy.  The Court finds that the predicted deterioration in D.E.'s cognition, social skills and self-care if D.E. is separated from the CABAS program, to which Dr. Fiorile has testified, constitutes psychological and physical harm sufficient to establish the "grave risk of harm" affirmative defense.  As even a brief separation

from the CABAS program will likely lead to a severe regression in D.E.'s progress, Respondent has shown by clear and convincing evidence that returning D.E. to Italy and separating him from the CABAS program poses a grave risk of harm to D.E. and would place him in an intolerable situation.

Furthermore, the testimony at trial established by clear and convincing evidence that E.E. and D.E. have a loving and close relationship and enjoy spending time in each other's company.  It was also established that E.E. helps his mother in caring for his brother.  Courts in this Circuit have frequently declined to separate siblings, finding that the sibling relationship should be protected even if only one of the children can properly raise an affirmative defense under the Hague Convention.  See, e.g., Blondin, 78 F. Supp. 2d 283, 291 (S.D.N.Y. Jan. 12, 2000) (declining to separate children because "children's relationships with their siblings are the type of intimate human relationships that are afforded a substantial measure of sanctuary from unjustified interference by the state") (quoting Aristotle P. v. Johnson, 721 F. Supp. 1002, 1005-06 (N.D. Ill. 1989)); Broca v. Giron, No. 11 CV 5818(SJ)(JMA), 2013 WL 867276, at *9 (E.D.N.Y. Mar. 7, 2013) (deciding not to "further fracture the family unit" and separate the siblings).  D.E. would face a significant disruption of his routine and general happiness were his older brother to return to Italy.  Such a separation is also likely to harm E.E., since the one parent with whom he has a good relationship would have to remain in the United States to care for D.E. Having found that D.E. would face a grave risk of harm if separated from the CABAS program and repatriated to Italy, the Court will not separate the two brothers.  Therefore, the Petition is denied as to both children, without prejudice to renewal if D.E. is no longer able to participate in the CABAS program and the Italian court system issues a final order requiring the return of the children to Italy.

<u>CONCLUSION</u>

For the foregoing reasons, the petition is denied without prejudice to renewal if

D.E. is not able to continue with his current CABAS program and the Italian court system issues a

final order requiring the return of the children to Italy.  Petitioner's request for an award of legal

fees and costs and expenses is also denied.

The Clerk of Court is respectfully requested to enter judgment for Respondent and

to close the case.

SO ORDERED.

Dated: New York, New York
       April 19, 2013

_____/S
LAURA TAYLOR SWAIN
United States District Judge